THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK MORTON, Appellant.

First Department, April 22, 1993

## APPEARANCES OF COUNSEL

*Natalie Rea* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Richard Sheridan* of counsel *(Billie Manning* with him on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

■ ■ Defendant appeals from his conviction, after a jury trial, of robbery in the second degree and related offenses, alleging error in, *inter alia,* the trial court's denial of his request for an adverse inference charge regarding a testifying officer's lost or destroyed handwritten notes, which, by the officer's own admission, were inconsistent with the typewritten version, and its refusal to permit defendant and his codefendant to attend the jury view of the crime scene. Since we believe that the first of these rulings denied defendant a fair trial and the second denied him his right to be present at a material stage of the trial, we reverse and remand for a new trial.

The following evidence was adduced at trial. On July 19, 1991, at about 2:00 A.M., the 80-year-old complainant, Lila Fitzgerald, who lived alone in apartment 5-L, a one-bedroom fifth-floor apartment at 1105 Jerome Avenue, a six-floor, residential building in the Bronx, was in bed, partially awake,

when, hearing a noise, she turned over and saw a man leap into her bedroom through the top portion of the window. The bedroom, facing Jerome Avenue, had two windows and a fire escape adjoining one of the windows. The complainant turned on a light on the night table next to the bed.

The complainant asked the intruder, later identified as Michael Smith, a codefendant herein, what he was doing; he demanded money. Within minutes, a second man, later identified as defendant, came in through the same window, holding a knife. Smith, older and taller than defendant, grabbed the complainant's hands and covered her mouth before he turned off the light. The complainant recognized him as the man who had stared at her the month before at a neighborhood check-cashing store. When the complainant began to scream and bang on the wall, defendant, holding a knife in one hand, held her in the bed with the other, while Smith rummaged through a dresser, eventually finding a wallet and removing $110, which he handed to defendant. When the complainant saw bright lights outside her window, she began to scream again. Smith and defendant, who, by now, according to the complainant, had been in the apartment for about 30 minutes, fled through a living room window, which also led to a fire escape at the back of the building.

Police Officers Cautillo and Meenagh, in their patrol car that morning, received a radio run shortly before 2:00 A.M. directing them to 1105 Jerome Avenue, where, on arrival, they checked the back alley and fire escapes before proceeding to the sixth floor. After speaking to the occupants of apartment 6-J and searching the fire escape and roof, the officers, in response to a second radio transmission, proceeded to the fifth floor and spoke to the tenant in apartment 5-K, who, pointing to the complainant's apartment, told them, "[T]hey're in there."

After speaking to the tenant, Officer Meenagh entered apartment 5-K and went out on the fire escape through the bedroom window and up to the roof. When he looked over the side, he saw two men coming out of apartment 5-L onto the rear fire escape. At about the same time, the complainant opened the door to apartment 5-L and allowed Officer Cautillo to enter. Cautillo searched the apartment, finding a living room window and the living room window gate open. Cautillo found a three-inch folding knife belonging to the complainant and a flashlight that was not hers on the lamp stand near the living room window.

Meanwhile, Officer Meenagh chased the two suspects down the fire escape. By shining his flashlight on him, he was able to see defendant's face. After jumping off the fire escape, Meenagh followed the two men through an alley, over two fences and up a stairway leading to Anderson Avenue, the street behind the complainant's apartment. Defendant, who had removed and discarded a hooded sweatshirt during the chase, ran ahead of Smith, who was limping noticeably after having jumped off the fire escape.

Officer Meenagh, who had made another transmission over his police radio, saw Smith attempt to hide under a car on Anderson Avenue, as defendant continued to run. Meanwhile, Police Officer MacShane, who had heard Meenagh's radio transmission, drove his patrol car onto Anderson Avenue and saw defendant running in his direction. As defendant slowed to a fast walk, MacShane saw Officer Meenagh pointing at both men. MacShane apprehended defendant while Meenagh took Smith into custody.

Both suspects were then taken to the hallway in front of apartment 5-L and the complainant was asked to look out of the peephole of her apartment door to see if she could make an identification. Looking through the peephole, the complainant said, "[Y]es, that's them, that's them. The shorter young guy and the taller, older guy, that's them". Neither defendant presented any evidence.

The jury acquitted defendant and Smith of burglary and robbery in the first degree and criminal possession of a weapon in the fourth degree but convicted them of, as noted, robbery in the second degree, as well as criminal possession of stolen property in the fifth degree and menacing. Defendant was sentenced to an indeterminate term of imprisonment of from 4 to 12 years and lesser concurrent terms.

Defendant claims that the trial court erred in denying his request for an adverse inference charge with respect to certain allegedly lost or destroyed handwritten notes pertaining to an injury sustained by Officer Meenagh during the chase of defendant and Smith on the night of the incident. During his redirect examination, Meenagh testified that he prepared a handwritten scratch copy of a line-of-duty injury report from which a typed report was prepared. The witness testified that he never saw the typed report until a few days before testifying and that he had never compared the typed report, which he had signed, with his handwritten notes. He further testified

that he did not have the handwritten notes and, although he did not destroy them, he did not know what happened to them. As soon as Officer Meenagh's testimony was concluded, defense counsel, out of the jury's presence, complained that the "scratch paper that led to [the] line of duty report" was "discoverable material that has not been provided to the defense" and asked for an instruction, which was denied with respect to it.

Given the sequence of events, the trial court was fully apprised of defendant's *Rosario* claim, although it was never so formally designated, and, thus, contrary to the People's argument, the issue is preserved. Moreover, the issue is reviewable. In this regard, the People argue that defendant failed to develop an adequate record by not seeking to establish the importance of the notes or the circumstances surrounding their absence. Once, however, the existence of *Rosario* material is shown, the People, if they are to be relieved of their obligation to disclose the material, have the burden of explaining its loss or disappearance *(People v Banch,* 80 NY2d 610, 620), and it is their obligation, not the defendant's, to make the proper record. If the People, as suggested in their brief, intended to raise any argument justifying nondisclosure, including a duplicative equivalent claim, it was their obligation to establish a record so that the point could be resolved on appeal. *(See, People v Quinones,* 73 NY2d 988, 989.)

Since 1961, when the Court of Appeals decided *People v Rosario* (9 NY2d 286, 289, *cert denied* 368 US 866), it has been the law of this State that a defendant in a criminal prosecution has the right to examine, for use during cross-examination, any written or recorded statements, not confidential, of a prosecution witness relating to the subject matter of that witness's testimony. This principle has been codified and a reciprocal obligation imposed on the defendant *(see,* CPL 240.45). As a result of case-by-case development, the rule has been refined to exclude harmless error analysis on review during direct appeal in cases where the People have failed to provide such material at trial. *(See, People v Jones,* 70 NY2d 547; *People v Ranghelle,* 69 NY2d 56; *People v Perez,* 65 NY2d 154.)* Not only do the People have a duty to produce *Rosario* material, they have a corresponding "obligation to preserve [such] evidence until a request for disclosure is made." *(People v Kelly,* 62 NY2d 516, 520.)* Where such material has been lost or destroyed and cannot be reproduced as a result of the People's failure to exercise care to preserve it and the defen-

dant is prejudiced, the court must impose an appropriate sanction. *(People v Martinez,* 71 NY2d 937, 940.) If the People are to be excused from their obligation to disclose *Rosario* material, they have the burden of establishing that the material "has been lost or destroyed and [of] explaining its disappearance." *(People v Banch,* 80 NY2d, *supra,* at 620.)

■ Here, Officer Meenagh's handwritten notes were not merely helpful but indispensable to defense counsel's cross-examination of the officer. The officer's credibility was placed squarely in issue as a result of certain inconsistencies between the typewritten line-of-duty report, which he had signed but, allegedly, not read, and his trial testimony. The inconsistencies related to the officer's status at the time in question (on duty at trial and off duty in the report); the location at which the officer suffered a cut on his arm (in the rear of the building at 1105 Jerome Avenue at trial and in the rear of 1105 College Avenue in the report) and the type of wire involved in sustaining his injury (razor wire at trial and razor wire and barbed wire in the report).

The officer blamed the inconsistencies on the clerical staff, claiming that the handwritten notes corroborated his testimony. Without the notes, there was nothing to contradict Office Meenagh, whose testimony on this point became virtually unimpeachable. It is difficult to assess the difference if the officer's notes, in fact, instead of corroborating his testimony, confirmed the typewritten report. Given the obvious prejudicial effect of the missing notes on the ability of defense counsel to cross-examine Officer Meenagh, the court had an obligation to impose a sanction. Whether the sanction of an adverse inference charge, as requested by defendant, was appropriate in the circumstances was a matter within the discretion of the trial court. *(See, People v Kelly,* 62 NY2d, *supra,* at 520.) Refusal to impose any sanction, however, constitutes reversible error.

In any event, given the state of the record, the refusal to impose a sanction mandates reversal, regardless of prejudice. As *People v Banch (supra)* makes clear, since there is an insufficient record to support the claim that Officer Meenagh's handwritten notes were lost or destroyed, the officer having testified only that he did not have them and did not destroy them, and the trial court having failed to conduct an inquiry into the contents of the material and the circumstances of its loss or disappearance, the automatic reversal rule is triggered. The People, of course, may show at the retrial that the report

has been lost or destroyed as well as the circumstances of such loss or destruction and the contents of the missing notes. The court may then impose the appropriate sanction based on the degree of prosecutorial fault, if any, and the resulting prejudice to defendant.

■ With respect to defendant's claimed exclusion from the jury view, a defendant and his counsel, absent a waiver, are, at the very least, statutorily entitled "as a matter of right [to] be present throughout" such viewing. (CPL 270.50 [2].) A defendant in a criminal case has "the absolute right to hear everything the jury hears" *(People ex rel. Lupo v Fay,* 13 NY2d 253, 256); he should also have the right to see everything the jury sees. Thus, defendant had the right to see what the jury saw through the complainant's peephole and to view the layout of the apartment. He also should have the opportunity to observe the reactions of the jurors as they viewed the premises.

The People, while conceding that defendant has a statutory right to be present at a jury view, argue that the claim is unpreserved as a matter of law. The argument is without merit. As with other sections of the Criminal Procedure Law codifying a defendant's right to be personally present during the trial of an indictment (CPL 260.20) and at specific stages of the criminal proceedings *(see, e.g.,* CPL 310.30 [right to be present where a deliberating jury requests and receives information]), the failure to comply with CPL 270.50 (2) affects the mode of proceedings and, thus, need not be preserved. *(See, People v Mehmedi,* 69 NY2d 759.)

In any event, the claim was preserved. After initially indicating that both defendants would be present—albeit "handcuffed and shackled"—during the jury viewing of the crime scene, on the day the viewing was to take place the court stated, over defendant's strenuous objection, that the defendants "will not be going to the scene", even in handcuffs. Defendant, arguing that he had been denied his right to be present at a critical stage of the proceedings, later moved for a mistrial, which was denied. Thus, it is clear that the issue was preserved.

While conceding the violation of defendant's right to be present at a jury view, the People argue harmless error. The violation of this right is not, however, subject to harmless error analysis. Where a defendant is absent during a material part of his trial, harmless error analysis is inappropriate.

*(People v Mehmedi,* 69 NY2d, *supra,* at 760.) While *People v Thorn* (156 NY 286), upon which the People rely, held that a jury view of the crime scene is not part of the trial, it should be noted that the statute governing jury views at the time, Code of Criminal Procedure § 411, which did not require the presence of the Judge during a jury view and which has been repealed, was a significant factor in the *Thorn* Court's reasoning. Since its successor, CPL 270.50, now requires the presence of a Judge, "it may well be urged that the view is a part of the trial." *(People v White,* 67 AD2d 571, 574, *revd on other grounds* 53 NY2d 721.)

■ One final point warrants discussion. At trial, the complainant was unable to make an in-court identification of either defendant. Upon being asked if she saw, in the courtroom, the two men who entered her apartment and robbed her, the complainant stated, "I don't see them"; "I really don't see them" and, "I'm sorry, your Honor, I don't see them". At no time did she state that defendants were not the perpetrators. Nor is there any indication that she did not identify them for fear of reprisal. Subsequently, Officer Cautillo testified that, on the night of the crime, after Smith and defendant's apprehension, the complainant viewed them through her peephole and exclaimed, "[T]hat's them, that's them. The shorter young guy and the taller, older guy, that's them." Defendant's attorney voiced no objection. Thus, defendant has failed to preserve his present claim that the admission of Cautillo's testimony recounting the complainant's prior out-of-court identification violated CPL 60.25 since her failure to identify him in court was not attributed to a lack of recollection. *(See,* CPL 470.05 [2]; *People v Paulin,* 70 NY2d 685.) Were the error preserved, we would reverse in light of the Court of Appeals recent holding, on similar facts, in *People v Quevas* (81 NY2d 41). As *Quevas* clearly holds, before a witness's testimony as to the complainant's out-of-court identification of the defendant may be admitted, a proper foundation, i.e., that the witness cannot identify the defendant on the basis of present recollection, must be laid. Our review of the record indicates that, while such a showing might well be made in this case, it was not on this record.

Accordingly, the judgment of the Supreme Court, Bronx County (Ivan Warner, J.), rendered January 29, 1992, convicting defendant, after trial, of robbery in the second degree, criminal possession of stolen property in the fifth degree, and menacing, and sentencing him to concurrent terms of impris-

onment of from 4 to 12 years, one year, and three months, respectively, to be served concurrently with a term of imprisonment imposed on an unrelated conviction, should be reversed, on the law, and the matter remanded for a new trial.

ROSENBERGER, KUPFERMAN and ASCH, JJ., concur.

Judgment of the Supreme Court, Bronx County, rendered January 29, 1992, convicting defendant, after trial, of robbery in the second degree, criminal possession of stolen property in the fifth degree, and menacing, and sentencing him to concurrent terms of imprisonment of from 4 to 12 years, one year, and three months, respectively, to be served concurrently with a term of imprisonment imposed on an unrelated conviction, is reversed, on the law, and the matter remanded for a new trial.